## THE ROSALIE HULL.

(District Court, S. D. New York. May 26, 1923.)

**1. Shipping ⟨⟩ 132(5)—Evidence held sufficient to show vessel properly equipped with dunnage.**

On libel of a wooden schooner for damages to a cargo of coffee from seawater, evidence *held* sufficient to show that the vessel was properly equipped with dunnage.

**2. Shipping ⟨⟩ 125—Putting into port to replenish meat supply and repair sails held not unjustifiable deviation.**

Where the progress of a wooden schooner was so impeded by adverse winds, or no wind at all, that she was forced to put into port to take on

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

fresh meat, and as a precautionary measure the sails were restitched, which delayed the voyage about nine days, *held*, that there was no unjustifiable deviation.

3. **Shipping** ⊕⟹**132(5)—Evidence held sufficient to show seaworthiness of wooden sailing vessel, and that unusual severity of storm caused damage to cargo.**

On libel of a wooden vessel for damages to a cargo of coffee from seawater, evidence *held* sufficient to show that the vessel was seaworthy, and that the damage was caused by the unusual severity of the storm, which caused the planking and hatch coamings to give and admit water through the seams, exonerating the vessel under Harter Act (Comp St. §§ 8029–8035).

In Admiralty. Libel by Stewart Carnal & Co., Limited, against the schooner Rosalie Hull. Libel dismissed.

Harrington, Bigham & Englar, of New York City (L. De Grove Potter, of New York City, of counsel), for libelant.

McFarland, Taylor & Costello, of New York City (Alfred H. Strickland, of New York City, of counsel), for claimant.

KNOX, District Judge. This libel was filed to recover damages for injury sustained by a cargo of coffee, through contact with seawater, on a voyage of the schooner Rosalie Hull, from Rio de Janeiro to New York. The injury being admitted, exoneration of the vessel is sought by reliance on the Harter Act (Comp. St. §§ 8029–8035), and the bill of lading exception of dangers of the seas.

The vessel is a four-masted wooden schooner 184 feet in length, 38 feet in width, and has a depth of 14 feet 7 inches. Her dead weight capacity is 1,250 tons, her gross 826, and the net 711. She was constructed in 1918, by the Georgia Shipbuilding Company, under the supervision and inspection of Lloyd's Registry. Upon completion, she was rated 12–A1, the highest mark available to a boat of her class.

Little or no affirmative claim is made by libelant that the ship was not properly constructed, or that she was in fact unseaworthy. It is, however, stoutly contended that there is no adequate proof of seaworthiness by libelant, that the vessel unjustifiably deviated from the usual and ordinary course of a voyage from Rio de Janeiro to New York, and that she was improperly dunnaged.

Prior to embarking upon the venture in question, the vessel had carried a cargo of coal from Savannah to Rio, and, so far as appears, she then acquitted herself creditably. For a return voyage to New York, the instant cargo was booked, and upon November 19, 1918, 16,000 bags of coffee were taken aboard; the master issuing a clean bill of lading. A week later the boat sailed from Rio; but, upon getting to sea, her progress was so impeded by adverse winds, or by no wind at all, that she was forced upon January 13, 1919, to put into Barbadoes to take on some fresh meat.

At most this task consumed but a few hours, and, had it not been that the schooner's master considered it to be his duty to have her sails restitched, she might at once have resumed her voyage. As it was, the sails were seen to have started, because of their flapping against the rigging on the way up from Rio, and the master, as a precautionary measure, thought it prudent to take advantage of the stop at Barbadoes,

⊕⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and restitch them. Accordingly, members of the crew, together with sailmakers from on shore, were occupied with the task from January 15th to January 23d. Two days after the work was completed, the ship weighed anchor and laid her course for this port. All went well until February 7th, at which time the vessel was some 250 miles southeast of Hatteras. Bad weather then made its appearance. This continued throughout the next day, and grew much worse upon the 9th, when, if the evidence of the ship is to be believed, the storm approached a hurricane in its fury. Such evidence is supported by Mr. Scarr of the Weather Bureau. According to him, a wind disturbance that had crossed the continent was passing out to sea off the coast of Georgia and South Carolina upon February 8th. It was not then severe, but upon the next morning it rapidly increased in intensity. At Hatteras the barometer fell twenty-six hundredths of an inch in 12 hours, while at Wilmington, N. C., the fall was more than half an inch. On the 10th a severe storm of cyclonic character came on to the eastward of Bermuda, and on the 11th it made its appearance at about latitude 40° north and longitude 55° east. To quote:

"* * * The storm * * * which passed across our country and off the Carolina and Georgia coasts on the 8th is the same storm that developed into a severe storm of almost hurricane force upon the 11th. * * * Such a storm would be accompanied by wind of gale force, * * * beginning at least as early as the afternoon of the 9th, and probably sooner. * * * The wind would be southeasterly or easterly at points south of Charleston, shifting easterly during the night of the 9th, between 8 p. m. of the 9th and 6 a. m. of the 10th to west or northwest, and continuing with increasing gale force."

Upon the 9th the ship took in the spanker, while the mizzen and foresails were reefed. Heavy cross-seas arose, causing the ship to pitch and toss. In the course of this, the forestay of the forward mast broke its fastenings in the knighthead. Then the mizzen and mainsail were taken in, but the jib, meanwhile, was blown to shreds, and the vessel, under bare poles, was put before the wind. To make matters worse, a heavy comber boarded the port quarter, and sprung the rudderhead, and the sheet bail on the fore boom parted, allowing the boom to strike the forerigging and carry away the topmast backstays.

During this period the vessel was swept with huge waves that filled the bulwarks, which were five feet in height, thus subjecting the decks and hatch coamings to an enormous pressure, variously estimated from 250 to 500 tons. For several days there was no particular let-up in the storm, and it was not until February 13th that sail could be set and the vessel put upon a definite course. In the interval, the shattered rudder head was growing weaker, and, while the heavy quartering seas continued, the vessel, for practical purposes, was not under control. On the last-mentioned date, the weather improved, the sea moderated, and the master having been unable to go towards Bermuda, as was then desired, a course was set for St. Thomas, where, after further vicissitudes, attributable to high winds and seas, the vessel came to anchor on the 23d.

On February 10th it became apparent that the cargo below decks had not escaped damage from the storm, for, upon that day, the working of the vessel's pumps brought up large quantities of coffee and

black water. They did so upon succeeding days, and just before reaching St. Thomas it was noticed that the cover to No. 3 hatch was warped from the swelling of the coffee beneath. Three days after the schooner reached St. Thomas, her master made application to the District Court for the appointment of surveyors of the vessel. The court appointed persons who seem to have been competent, and they reported as follows:

"We sounded the pumps with an interval of one hour, and found that the vessel during this time had made one-quarter of an inch as she now lies at anchor in this harbor. Found No. 3 hatch well-battened, tarpaulined, caulked, soaped, and properly secured; also found same bulged from expansion of the cargo. We opened this hatch and found cargo in the wake all damaged and somewhat beyond. We also found No. 2 and No. 1 hatches battened, tarpaulined, caulked, soaped, and properly secured. We opened these hatches, and found the cargo in the wake steamed and in bad condition, apparently water penetrating through the seams of the hatchway coamings. Two eyebolts of the forestay broke, and stay secured by temporary tackle. Main jib entirely gone, leaving fragments. Port carriebit carried away, foreboom broken, and sheet traveler of same broke, starboard foretopmast backstay chainplates broken, and turnbuckle on aftershroud of forerigging bent. Foretopmast backstay carried away in the splice. Mizzen sail split across the reefband, and afterleach rope partially gone. Foresail split at reefband and rope started on afterleach. Butts in the waterways and caulking around the hatch coamings to be looked after. Rudderhead shattered."

Thereafter cargo surveyors were appointed. They examined bags of coffee beneath and in the rear of the hatches to an extent, where the bags, instead of being rotted and mildewed, were merely stained, and as a result of such examination condemned 789 bags of coffee. These were taken out to sea and dumped. Repairs costing about $5,000 were made to the schooner, the cargo was retrimmed in part, and upon March 31 the ship once more set sail for New York, where she arrived upon April 24, the last lap of the trip having been without particular incident.

[1] When the cargo was discharged, it was found that a considerable quantity of coffee was damaged. The bottom tier of bags had been wetted through, bags stored on the timber brow in the neighborhood of the hawsepipes had also been wet, as were bags along the sides of the hold. Libelant attributes this damage to improper storage, and much testimony has been taken upon this branch of the case. The chief point of attack was that the side ceiling of the vessel's hold was covered by a grass matting, whereas it should have dunnaged along the sides with vertical scantling, with boards, running horizontally, nailed thereto.

The master of the schooner superintended the laying of the dunnage at Rio, and he says it was 12 inches thick upon the floor and 15 or 16 inches at the turn of the bilges. Proctor, a local surveyor, called by claimant, and who was on the schooner before the dunnage was removed, says that according to his measurements it was 16 inches at the keelson, and 12 inches on top of the thick strakes in the wing. Wheldon, one of libelant's surveyors, says it was 10 inches amidships and 11 to 12 inches at the turn of the bilge. He had no criticism to offer as to such dunnage as was found, but stated that for a distance of 30 feet forward of the sternpost there was no dunnage at all. Other

witnesses gave more or less conflicting testimony on the thickness and distribution of dunnage, and there is some doubt as to whether it had been disturbed at the time the several inspections were made. The result of all the evidence, in my opinion, is that the vessel was properly equipped in the matter of floor dunnage.

As to the matting upon the ceiling of the ship, its only real purpose, of course, was to keep the coffee bags clean. The ceiling of the ship is tongued and grooved; it is placed at a distance of 12 inches or more inside the outer planking of the hull. If the ship was seaworthy in the first instance, there was no reason to suppose that leakage from the outside would be sufficient to enable the water to spout from the vessel's seams onto the ceiling, and thus damage the cargo stored within. Such leakage as reasonably might have been anticipated would no more than run down inside the outer planking towards the bilges. If, however, the leakage came from the waterways, the hatches, or the opening of the seams, it would doubtless be, as it unquestionably was, in substantial quantities, and could not help but reach the cargo, irrespective of how much dunnage might have been upon the sides of the hold.

Darragh, port captain of the claimant, saw the vessel upon her arrival here. She then showed signs of very heavy weather around the top rail and hatch coamings, and signs of leakage were to be observed around the hatches, around the waterways on the starboard side, the bow ports, and underneath the deck in various places. He examined the dunnage, and measured it as being from 14 to 15 inches in depth. Not only had it been submerged, but practically the whole of the lower tier of coffee bags. Any such leakage passes beyond a question of dunnage, and becomes one of whether it was brought about by a peril of the sea or by unseaworthiness. I think, therefore, the matter of dunnage is safely out of the case. But, before going into detail as to the presence of a sea peril, I shall take up the alleged deviation of the ship.

[2] While the bill of lading contained a clause which permitted a departure from the route of the voyage, its evident purpose was to protect the ship against the consequences of a deviation arising through the exigencies of the war, and in terms, at least, did not contemplate a deviation for other causes. Inquiry must accordingly be made as to whether the stop at Barbadoes, and the time spent there, constituted a deviation that will inflict liability upon the ship.

It seems to me there is no occasion to so hold. The trip from Rio de Janeiro had taken 45 or 50 days; the fresh meat on board had turned bad; a large part of the voyage was yet to be undertaken, and it cannot properly be said that the vessel was not entitled to replenish her food supply. Indeed, I take it, libelant does not make such claim. Its argument is that, the supplies having been taken aboard, the subsequent delay was unjustifiable. But let us see:

According to the log, the vessel anchored at Barbadoes on January 13th. The following day was marked with rain squalls. On the 15th the crew was put to work sewing sails, continuing through the next day. On the 16th, not only the crew, but three sailmakers from on shore, were at work. With the exception of the intervening Sunday,

the restitching continued through to January 23d, when that work, together with some repairs to a boom, was completed. The ship was ready for sea on the 24th, and sailed the next morning. From this it would seem there was no inexcusable delay at Barbadoes, and I believe the master to have been warranted in restitching the sails. Had he not done so, and thereafter the ship had met with the experiences enumerated, it would have been urged upon me that he should have stopped to repair her sails. I shall not sustain the claim of deviation.

[3] It was said in The Governor Powers (D. C.) 243 Fed. 961, that the presence of a sea peril "is a question of fact, to be determined upon by the circumstances of each case, depending upon whether a seaworthy ship, properly trimmed, and with the cargo properly stowed, would ordinarily go through such seas without material injury to its cargo." Goldthwait, one of the surveyors at St. Thomas, testified that the ship bore every evidence of being in first-class, seaworthy condition when she started on her voyage.

The caulking seemed to be all right, and, in order to tell if the vessel had leaked about the hatch coamings, it was necessary to remove the hatch covers. He examined the coamings and found their construction to have been carried out in the only proper way. The oakum in the seam was tried with a heavy knife and was found to be hard. It was his opinion that the eyebolts with which the forestay was held, and which were somewhere about two inches in diameter, gave way as the result of extremely heavy weather and the consequent laboring of the ship. To break eyebolts of that size would take "very unusual weather and sea"; also the way in which the rudderhead was shattered would indicate that the ship had passed through "some extremely bad weather."

The mate said the wind of the storm in question was stronger than any gale he was ever in, and that the sea likewise was the worst, owing to the shifting of the wind and the contrary character of the waves. He never saw so much water on a deck, but notwithstanding he had no fear so far as the worthiness of the vessel was concerned, because he knew she was all right. He had examined the caulking on deck and in the bow ports before leaving Rio, performing the task with an iron and a knife, and found it in first-class condition. It is his belief that the large volume of water that came on deck bent the planks down, allowing the water to get into the hull, and the moment the water left they would spring back and tighten up.

The master likewise inspected the bow ports before leaving Rio and found them "in perfect condition." There had been no leakage through them on the way south and during the trip from Rio to Barbadoes, the vessel had leaked only to the extent that a wooden vessel is expected to leak. He describes the wind as a "strong gale or a small hurricane," and estimates the wind velocity to have been 60 or 70 miles an hour. The sea was very rough, and confused on account of the shifting of the winds, causing the water to pile upon the decks, and the vessel to roll and pitch. Through the springing of the rudder, the ship was "practically helpless"; she couldn't "heave to," because the captain "was afraid the rudderhead would go and he wouldn't have anything at all."

Under these circumstances, the ship must have been subjected to great strain, and it was this, no doubt, that caused her planking and hatch coamings to give, and admit water through the seams. Such is the opinion of the captain, and I see no reason to conclude otherwise. In connection with the acceptance of the testimony of the captain and mate in this regard, it is worth while to remark that at the time their evidence was given neither was connected with the ship or her owners.

It may also be said that, upon coming from St. Thomas to New York, the ship leaked no more than she did upon the trip from Rio to Barbadoes, which fact indicates that the damage done to the cargo was due to the storm of February 9th to the 13th. Of course, a ship sailing up the Atlantic coast in February has reason to anticipate and must be prepared to withstand severe storms; but it is most difficult to find just when a storm reasonably to be expected becomes one of unusual intensity. The best that I can do here is to say that in ordinary storms properly constructed irons are not broken, nor are rudderheads commonly shattered, and that when such occurrences take place, upon well-constructed vessels that have diligently been examined before setting out, it is not unreasonable to suppose that planking and hatch coamings will also yield to the force of the elements.

For such reason, I find in favor of the ship. The question is a close one, but upon the whole I think the evidence favors the claimant, and it may have a decree dismissing the libel.